

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CROCITTO, Derivatively on Behalf of Facebook, Inc., | Case No. |
| Plaintiff, | |
| vs. | |
| MARK E. ZUCKERBERG, JAMES W. BREYER, PETER A. THIEL, MARC L. ANDREESSEN, ERSKINE B. BOWLES, DONALD E. GRAHAM, and REED HASTINGS, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | |
| FACEBOOK, INC., | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

Plaintiff Robert Crocitto  ("Plaintiff"), by and through his attorneys, brings this action derivatively on behalf of nominal defendant Facebook, Inc. ("Facebook" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, other litigation relating to the subject transaction, and other publicly available information regarding the Facebook, as follows:

1.     This is a shareholder derivative action brought on behalf of the Facebook.  The complaint seeks relief against Facebook's Board of Directors (the "Board"), consisting of Defendants Mark E. Zuckerberg, James W. Breyer, Peter A. Thiel, Marc L. Andreessen, Erskine B. Bowles, Donald E. Graham, and Reed Hastings (collectively the "Individual Defendants"), to

remedy breaches of their fiduciary duties in connection with the Company's May 18, 2012 Initial Public Offering ("IPO") of common stock.

2.     After the IPO occurred, Facebook's stock price dropped precipitously.  On May 22, 2012, it was discovered that Facebook had, shortly before the IPO, selectively and verbally disseminated material information to its underwriters, who, as agents for Facebook,  in turn verbally disseminated such information to select institutional investors, *i.e.* that Facebook was lowering previously-announced guidance.  This information was not disseminated publicly to other prospective purchasers in the IPO.   As a result of this news, the stock price plummeted, and Facebook is now subject to various lawsuits and governmental and regulatory investigations, and has suffered significant injury by increasing its cost of raising additional capital as well as significant reputational harm.  The present cost of capital to Facebook has been made more expensive, and the disclosure of the misconduct outlined here has damaged the Company's credibility as a platform which customers and advertisers wish to be associated with as a "premium" location.  Additionally, Facebook now faces staggering liability from these actions, not including the substantial expense of defending itself.

3.     The Board breached their fiduciary duties by failing to take steps to prevent this conduct from occurring.  Furthermore, the Board cannot be expected to act on Facebook's behalf in a disinterested and independent manner, because, as Columbia Law School Professor John Coffee stated, "[p]retending that Facebook will have an independent board . . .  is like putting rouge on a corpse."

4.     On December 17, 2012, Morgan Stanley, one of Facebook's underwriters, entered into a Consent Order with the Massachusetts Securities Division (the "Consent Order"), whereby it settled claims concerning its role in Facebook's IPO for $5 million.  This Consent Order reflected an implicit acknowledgement of the substantial costs that have been imposed upon participants in the IPO due to their misconduct and, despite its size, does not even begin to satisfy or eliminate all litigation risks and expenses related to this IPO for either Morgan Stanley, Facebook, or the individuals named as defendants in this action.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(a)(1) because: (1) a substantial portion of the transactions and wrongs complained of herein, including the improper dissemination of financial information by Facebook's underwriters and/or institutional investors, occurred within this Judicial District, and (2) Defendants have received substantial compensation by engaging in numerous activities that have had an effect in this Judicial District.

## THE PARTIES

7.     Plaintiff Robert Crocitto beneficially purchased Facebook shares through the purchase of Series 2 Membership Units of SharesPost Private Investments II, LLC on March 4, 2011 and May 25, 2011.  The Series 2 Membership Units converted into Class B Common Stock of Facebook upon the IPO.   Mr. Crocitto has continuously held his ownership interests in Facebook since the time of those purchases, up to and continuing through the time of all of the efforts culminating in the IPO.  Mr. Crocitto is a resident of Washoe County, Nevada.

8.     Nominal Defendant Facebook is a social media company that is incorporated in Delaware and headquartered at 601 Willow Road, Menlo Park, California 94025.

9.     Defendant Mark E. Zuckerberg is the Chairman of the Board and Chief Executive Officer ("CEO") of Facebook.   He has been CEO and a Director since July 2004.   Mr. Zuckerberg has served as Chairman of the Board since January 2012.  Mr. Zuckerberg is a resident of California.

10.     Defendant James W. Breyer has been a director since April 2005.  Mr. Breyer has been a Partner of Accel Partners, a venture capital firm, since 1987, and currently serves as President of Accel Management Co., Inc.  Mr. Breyer is a resident of California.

3

11.     Defendant Peter A. Thiel has been a director since April 2005.  Since 2005, Mr. Thiel has been a Partner of Founders Fund, a venture capital firm. Mr. Thiel has also served as President of Clarium Capital Management, LLC, a global macro investment manager, since 2002. Mr. Thiel is a resident of California.

12.     Defendant Marc L. Andreessen has been a director since June 2008.   Mr. Andreessen is a co-founder and has been a General Partner of Andreessen Horowitz, a venture capital firm, since July 2009. Mr. Andreessen is a resident of California.

13.     Defendant Erskine B. Bowles has been a director since September 2011.  Mr. Bowles is President Emeritus of the University of North Carolina and served as President from January 2006 through December 2010.  Mr. Bowles has also been a Senior Advisor of BDT Capital Partners, LLC, a private investment firm, since January 2012.   Mr. Bowles currently serves as a member of the boards of directors of Morgan Stanley, Belk, Inc., and Norfolk Southern Corporation.  Mr. Bowles is a resident of North Carolina.

14.     Defendant Donald E. Graham is the "Lead Independent Director."  Mr. Graham has served as the Chief Executive Officer of The Washington Post Company, an education and media company, since 1991 and as Chairman of its board of directors since 1993. Mr. Graham is a resident of the District of Columbia.

15.     Defendant Reed Hastings has been a director since June 2011.  Mr. Hastings has served as the CEO and Chairman of the board of directors of Netflix, Inc., a provider of an Internet subscription service for movies and television shows, since 1999.  Mr. Hastings is a resident of California.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and not in furtherance of their personal interest or benefit.

17.     Each director and officer of the Company owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company.

18.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Facebook, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions with Facebook, each of the Individual Defendants had access to adverse, non-public information about the unlawful conduct alleged herein.

19.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of Facebook, and was at all times acting within the course and scope of such agency.

20.     To discharge their duties, the officers and directors of Facebook were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Facebook were required to, among other things:

a.   manage, conduct, supervise and direct the business affairs of Facebook in accordance with all applicable laws, rules, and regulations;

b.   neither violate nor knowingly permit any officer, director or employee of Facebook to violate applicable laws, rules, and regulations;

c.   neither engage in self-dealing nor knowingly permit any officer, director or employee of Facebook to engage in self-dealing;

d.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

e.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

f.   properly and accurately guide investors regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

g.   preserve and enhance Facebook's reputation as a publicly-traded company, and to maintain public trust and confidence in Facebook as a prudently managed corporate entity fully capable of meeting its duties and obligations, including its  public reporting obligations;

h.   remain informed of how Facebook conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws and regulations.

21.     Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and officers of Facebook, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Facebook's Board.

22.     The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the company from taking such illegal actions.

23.     Each of the Individual Defendants has been named as a defendant in the pending securities class actions that alleged violations of Section 11, 12(a)(2), and 15 of the Securities Act of 1933.  As defendants in the securities class actions, each of the Individual Defendants is potentially liable for substantial damages.

## SUSBSTANTIVE ALLEGATIONS

24.     On February 1, 2012, Facebook filed a Form S-1 registration statement with the SEC.  Throughout the next several months, Facebook repeatedly amended the Form S-1.

25.     On April 16, 2012, David Ebersman, Facebook's CFO, informed select analysts that Facebook's internal revenue forecasts for the second quarter of 2012 ("2Q12") ranged from $1.1 to $1.2 billion, and the revenue forecast for 2012 was $5 billion.  Consent Order at ¶¶ 28-29. No small public-market investors were informed of this guidance.

26.     The analysts used these estimates to prepare their models.  Morgan Stanley's revenue estimates for 2Q12 and 2012 were $1.175 billion and $5.026 billion, JPMorgan's were

$1.182 billion and $5.044 billion, and Goldman Sachs' were $1.207 billion and $5.169 billion, respectively. *Id.* at ¶ 32.  While these analysts verbally shared these estimates with salespeople and big institutional investors, no small investors ever got them.

27.    On May 3, 2012, Facebook filed an amended Form S-1 indicating a maximum offering price of $35 per share and 388 million shares to be sold in the IPO.

28.    On May 7, 2012, Facebook began its roadshow.  Around this time, Ebersman informed Morgan Stanley's Michael Grimes that he was not as confident in the projections that he previously told them, due to user growth outpacing ad growth. *See id.* at ¶¶ 42-45.  Grimes then called others at Morgan Stanley to warn them of this. *Id.* at ¶¶ 47-48.

29.    Grimes then contacted Ebersman about providing updated guidance to analysts without "creating the appearance of not providing the underlying trend to all investors." *Id.* at ¶ 55.

30.    The next day, representatives of Facebook and Morgan Stanley, along with their counsel, had a call to discuss how they could avoid the appearance of sharing negative information with only a select group of investors.  Counsel recommended that Facebook update language in the prospectus to include a clearer warning about the possible impact of Facebook's mobile growth on revenue. *Id.* at ¶¶ 56-57.

31.    On May 9, 2012, Ebersman emailed Facebook's board, notifying them that they would be updating the Form S-1 to include such cautionary language.

32.    Grimes also suggested that Ebersman speak with other analysts to provide them with the downward guidance.  Facebook's management decided that Facebook's Treasurer Cipora Herman should be the one to speak to analysts by phone. *Id.* at ¶ 63.  Because of the sensitive nature of these calls, Grimes and Herman rehearsed these calls, with Grimes playing the part of an analyst. *Id.* at ¶ 65.  In fact, Grimes prepared a script for Herman to follow. *Id.* at ¶ 67.  The script provided for specific lower revenue estimates, including estimates of 3 to 3.5 percent off the $5 billion target for 2012. *Id.* at ¶¶ 81-82.

33.     On May 9, 2012, at 5:03 p.m., the amended Form S-1 was filed, and it made no mention of lowered guidance. *Id.* at ¶ 69.   This amended Form S-1 expressed caution about revenue growth due to a rapid shift by users to mobile devices (mobile advertising is generally less lucrative than advertising on desktop computers), stating as follows:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

34.     Twelve minutes after the Form S-1 was filed, Herman started calling the analysts. Grimes stayed with her for the first two calls. *Id.* at ¶¶ 70-71.   Grimes later informed Ebersman that Herman was a "champ" on those calls. *Id.*   Herman ultimately talked with 15 analysts that night and the following morning. *Id.* at ¶ 73.

35.     As a result of these calls, Morgan Stanley, JPMorgan, and Goldman Sachs all cut their 2Q2012 and 2012 estimates. *Id.* at ¶¶ 79, 83-87.   Again, while these estimates were shared verbally with select big investors, the public never found out about them until after the IPO had priced.

36.     On May 15, 2012, General Motors announced that it was pulling its advertising business from Facebook, stating that Facebook ads were less effective than other forms of advertising.   This move by GM cost Facebook at least $10 million in annual revenue.

37.     Despite this negative news and lowered internal estimates, that same day, Facebook raised its expected IPO price to $34-38 per share, from the previous expectation of $28-35 per share.   Facebook also increased the number of shares in the IPO from 388 million to 484.4 million shares.

38.     Facebook filed its final Form S-1 on May 16, 2012.

39.     On May 18, 2012, Facebook launched its IPO at a price of $38 per share.  In the IPO, Defendants sold more than $16 billion in stock.  In fact, Defendant Zuckerberg sold over 30 million shares in the IPO for gross proceeds of over $1.1 billion, Defendant Breyer (and entities he controls) sold over 50 million shares in the IPO for gross proceeds of over $2.1 billion, and Defendant Thiel  (and entities he controls) sold over 16 million shares in the IPO for gross proceeds of over $600 million.

40.     Because Ebersman and Herman verbally conveyed material information to the underwriters that was not made public, and the underwriters conveyed such material information only to select investors, Facebook potentially violated a number securities law and financial regulations.  Furthermore, this conduct has become front page news that has placed Facebook and its management in a negative light, and has thus brought significant reputational harm to the Company and significantly increased the cost of raising capital in the future.

41.     On May 22, 2012, it was also revealed that both the SEC and the Financial Industry Regulatory Authority ("FINRA") were investigating the selective dissemination of material information described above.  Additionally, a Congressional inquiry began and certain states, such as Massachusetts, also started to investigate Facebook's conduct.  Furthermore, numerous class action securities lawsuits have been filed against Facebook for the conduct described above.

42.     On December 17, 2012, Morgan Stanley, one of Facebook's underwriters, entered into the Consent Order with the Massachusetts Securities Division, whereby it settled claims concerning its role in Facebook's IPO for $5 million.  This settlement did not eliminate Morgan Stanley's exposure to all material liabilities relating to the IPO, nor did it in any way immunize Facebook or the Defendants here.

43.     An article published on December 19, 2012 on BLOOMBERG.COM, titled "Morgan Stanley Case Exposes Facebook to Similar Challenges," explained Facebook's potential liability from its conduct:

Facebook Inc. (FB), the world's largest social-networking company, could be exposed to legal challenges surrounding its initial public offering similar to those faced by Morgan Stanley (MS), according to legal experts.

In the first regulatory claims to flow from the May 17 IPO, Massachusetts officials said on Dec. 17 that they fined Morgan Stanley $5 million for letting its investment bankers provide research analysts specific revenue information that was not disclosed by Facebook to the general public. That broke a decade-old rule enacted after the dot-com crash to block bankers from influencing analysts, Massachusetts said.

The settlement includes for the first time details of the closed-door conversations between Morgan Stanley and Facebook ahead of the IPO, including testimony from Michael Grimes, who led the deal for the bank. According to the consent order, Grimes wrote a script for Facebook's then-treasurer to read to analysts that detailed Facebook's lowered revenue estimates.

Grimes "did everything but make the phone calls himself," the regulator said in a statement. Grimes was identified in the settlement only as a "senior investment banker," though it provided biographical details that match his.

**The revelation that Facebook gave specific estimates to bank analysts and not to the public revives questions about whether the company was sufficiently forthcoming ahead of the IPO, said Stephen Diamond, an associate professor at Santa Clara University School of Law.**

**'Denied Access'**

**"By providing that information to just a subset of potential investors, in essence they have denied other investors access to material information," Diamond said. The Securities and Exchange Commission "should have pushed much harder to find out whether there was quantifiable data available or not," he added.**

Facebook has not been accused by regulators of wrongdoing. Michael Buckley, a spokesman for the Menlo Park, California- based company, declined to comment, as did John Nester, a spokesman for the SEC. New York-based Morgan Stanley did not admit or deny the Massachusetts claims in settling.

The settlement offers fresh insight into a widely anticipated IPO that turned into a debacle for the company and Morgan Stanley. Facebook shares have tumbled 27 percent since they started trading for $38 on May 18, to $27.71 as of the close yesterday. The company capitalized on its popularity among consumers by raising the price and number of shares sold to retail investors, who weren't privy to the private conversations or revenue estimates.

11

Class Action

William Galvin, the Secretary of the Commonwealth of Massachusetts, said he didn't have the authority to determine whether Facebook executives acted improperly.

**"The broader issue is the fairness of the marketplace for investors," Galvin said in an interview this week.**

**The details emerging from the consent order may also add ammunition to dozens of class actions, which a judge ordered to be consolidated earlier this month. The testimony disclosed by Massachusetts could be used by prosecutors attempting to make a case that Facebook and Morgan Stanley misled investors, said Erik Gordon, a clinical assistant professor at the University of Michigan's Stephen M. Ross School of Business.**

**"The real liability for Facebook and Morgan Stanley is yet to come," said Gordon.**

**If Facebook omitted material facts in its prospectus, known as an S-1, it could be found in violation of Section 11 or Section 12 of the Securities Act of 1933, Diamond said.**

**'Scariest Thing'**

**While it told potential investors that mobile usage could adversely affect revenue, the revelation that it gave a select group of analysts specific numbers on how that trend would affect sales over the full year could be considered a material omission, he said.**

**A violation of Section 11 could result in a fine or injunctive relief, or it could force the company to return proceeds of its IPO to shareholders, Diamond said.**

**"A material misstatement or omission in an S-1 is the scariest thing in the world," Gordon said. "It's going to hinge on whether the disclosures made in the S-1 were sufficient to give reasonable investors as accurate a view as reasonably possible."**

[Emphasis added.]

## DAMAGE TO FACEBOOK

44.     As a result of the Individual Defendants' conduct, Facebook has exposed itself to litigation and possible governmental or regulatory actions, and has thus exposed itself to millions of dollars, if not tens or hundreds of millions of dollars, in attorneys' fees, fines, and or litigation settlements.

45.     Furthermore, the Individual Defendants' conduct has presently caused Facebook significant harm both to its cost of capital as well as to it financial and management reputation .which in turn makes it more expensive for it to raise capital of all kinds..   As stated on Slate.com, in an article titled, "One Reason for the Facebook IPO Mess: Zuckerberg Didn't Care":

> True, the company's earlier backers, who were able to unload more than $10 billion of stock at the highest possible price, may consider the deal worthy of high-fives and Cristal. **But the combination of a stock already trading well below its offer price, annoyed retail investors - many of them Facebook users - and regulatory probes constitutes a botched deal.** And that's without mentioning trading glitches, which were presumably beyond the company's control.

> There's also the impact on Facebook's reputation and morale. **Where the Silicon Valley titan was once viewed as a benign force connecting people, albeit with occasional privacy concerns, it now risks being synonymous with Wall Street money-grubbing. That's bad for a product dependent on consumers. It's also harmful for morale internally and, along with a listless stock price, for recruitment.**

> [Emphasis added.]

46.     The present harm suffered by Facebook has already increased it cost of capital because of its bloated equity structure as well as the reputational damaged with increases the perceived risk of investing in Facebook therefore, increases the demanded return on capital invested in Facebook to offset the increased risk. Thus, Facebook has suffered a current injury, not merely the prospect of future injury, because it has already become more costly and difficult for the Company to raise capital by reason of the acts of the defendants.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

47.     Plaintiff brings this action derivatively in the right and for the benefit of Facebook to redress injuries suffered, and to be suffered, by Facebook as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Facebook is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

48.     Plaintiff will adequately and fairly represent the interests of Facebook and its shareholders in enforcing and prosecuting its rights.

49.     Plaintiff is the owner of Facebook common stock and was the owner of Facebook common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

50.     At the time that this action was commenced, the Board consisted of the following directors: Defendants Mark E. Zuckerberg, James W. Breyer, Peter A. Thiel, Marc L. Andreessen, Erskine B. Bowles, Donald E. Graham, and Reed Hastings.

51.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

52.     Defendant Zuckerberg is not an independent director because he is currently serving as the Company's Chairman and CEO, and before the IPO was a 25% owner of Facebook. Immediately after the IPO, Zuckerberg sold 30.2 million shares for $1.1 billion, and thus had an interest in keeping the IPO price artificially inflated. Similarly, Zuckerberg's controls 57% of the voting shares, including both Class A and Class B stock. Furthermore, if any owner of Class B stock besides Zuckerberg sells shares, the shares convert to Class A stock,

14

so he controls Facebook more firmly. This also demonstrates his control over the board, and as such neither he nor the board can independently or impartially consider a demand to sue or otherwise take action on behalf of Facebook. Accordingly, Zuckerberg is not disinterested and cannot fairly evaluate a demand.

53.    Defendant Breyer is a partner at Accel Partners. In May 2005, Breyer invested $12.7 million in Facebook for a 10.7% ownership stake through Accel Partners, and Breyer himself invested an additional $1 million. Accel and Breyer unloaded over 50 million shares in connection with the offering, and thus had an interest in keeping the IPO price artificially inflated. In fact, in the IPO, Defendant Breyer (and entities he controls) eventually sold their shares in the IPO for gross proceeds of over $2.1 billion Accordingly, Breyer is not disinterested and cannot fairly evaluate a demand.

54.    Defendant Thiel was an early Facebook investor through his Founders Fund venture capital firm, and before the IPO had a 3% stake in Facebook. Immediately after the IPO, Thiel sold 16.8 million shares for $633 million, and thus had an interest in keeping the IPO price artificially inflated. Accordingly, Thiel is not disinterested and cannot fairly evaluate a demand.

55.    Defendant Bowles sits on the board of Morgan Stanley, the lead underwriter that improperly and selectively disseminated nonpublic information it received from a Facebook executive. As a result, Morgan Stanley is subject to litigation and regulatory and governmental investigations. Bowles cannot be expected to take any action, on behalf of Facebook, that would harm Morgan Stanley. Accordingly, Bowles is not disinterested and cannot fairly evaluate a demand.

56.    Defendant Andreessen is conflicted because he is co-founder of venture capital firm Andreessen Horowitz, which had a significant private investment in Facebook before it went public. Andreessen Horowitz also made $78 million from a $250,000 seed investment in Instagram, a company that was recently acquired by Facebook for $1 billion. The FTC is reportedly investigating this acquisition. Accordingly, Andreessen is not disinterested and cannot fairly evaluate a demand.

15

57.     Defendant Graham is the CEO of The Washington Post Company.   THE WASHINGTON POST is a major advertiser with Facebook: from 2009 through 2011, The Washington Post spent $9.6 million on Facebook ads.   THE WASHINGTON POST is also affiliated with SocialCode, an ad agency whose clients do business with Facebook.   Furthermore, Graham's daughter Molly has been a Facebook employee since 2009, and earned over $400,000 between 2009 and 2012, and also received restricted shares granted to her through the employee stock incentive plan.   Accordingly, Graham is not disinterested and cannot fairly evaluate a demand.

58.     Defendant Hastings is CEO of Netflix.   Netflix is a major advertiser with Facebook: from 2009 through 2011, Netflix spent $7.3 million on Facebook ads.   Accordingly, Hastings is not disinterested and cannot fairly evaluate a demand.

59.     Furthermore, Defendant Zuckerberg is on the nominating committee, the committee that determines the composition of the board.   Because Zuckerberg is on this committee, he has significant control of the composition of the board, and can either entrench the current members that act in accordance with his wishes, or appoint new members to do his bidding.   For this reason as well, the whole board is not disinterested and cannot fairly evaluate a demand.

60.     Furthermore, each Individual Defendant signed, or directed their signature, on the registration statements at issue.   For this reason as well, the whole board is not disinterested and cannot fairly evaluate a demand.

61.     In fact, an article on THE WALL STREET JOURNAL'S blog, titled "Facebook Board Raises Eyebrows," dated February 2, 2012, quoted Columbia Law School Professor John Coffee as saying  that "[p]retending that Facebook will have an independent board . . . is like putting rouge on a corpse."   He stated that Facebook's Board has made "a brazen insistence that they are not going to let Wall Street impose their rules" concerning the seating of a truly independent board.

16

## COUNT I

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

62.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

63.     The Individual Defendants owed a fiduciary duty to Facebook to supervise the issuance of the news concerning the company's financial condition or prospects, and ensure that such issuance was not done in violation of applicable laws or regulations. Additionally, by reason of their positions as directors, officers and controlling shareholders of Facebook, the Individual Defendants owed Facebook and its stockholders fiduciary duties of care, loyalty, candor, good faith and fair dealing.

64.     As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over management, policies, practices, controls, and financial and corporate affairs of Facebook.

65.     The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Facebook's internal controls and by allowing the Company to issue material financial information only to select entities, in violation of applicable laws or regulations.

66.     Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that Facebook complied with applicable laws, rules, and regulations.

67.     As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of them had knowledge of and actively

participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

68.     Each of Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws and regulations, and therefore were not the product of a valid exercise of business judgment. Rather their acts constituted a complete abdication of their duties as officers and/or directors of the Company. As a result of Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

69.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

70.     Defendants had a duty to Facebook and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company. Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Facebook in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Facebook's affairs.

71.     During the course of the discharge of their duties, Defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, Defendants

caused Facebook to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Facebook, thereby causing damage to the Company.

## COUNT III

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

72.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

73.     Facebook is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company.

74.     Facebook's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Facebook, by virtue of the Individual Defendants' misconduct.

## COUNT IV

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

75.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

76.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over Facebook.

77.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

## COUNT V

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

78.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

79.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of Facebook.

80.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

a.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

b.     For an order setting an emergency shareholder vote date for election of new directors;

c.     Directing Facebook to take all necessary actions to reform and improve its corporate governance and internal control procedures so that they comply with relevant laws;

d.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

e.     Granting such additional and different relief as the interests of justice or equity

may require.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 4, 2013

**GLANCY BINKOW & GOLDBERG LLP**

By: *[signature]*

Gregory B. Linkh (GL 0477)
glinkh@glancylaw.com
77 Water Street, Suite 721
New York, NY  10005
Telephone: (646) 722-4180

Michael M. Goldberg
mgoldberg@glancylaw.com
Ex Kano S. Sams II
esams@glancylaw.com
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Stephen R. Basser
sbasser@barrack.com
**BARRACK, RODOS & BACINE**
One America Plaza
Suite 900
San Diego, CA  92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

Mark R. Rosen
mrosen@barrack.com
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA  19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838


Richard S. Wayne
rswayne@strausstroy.com
**STRAUSS & TROY**
The Federal Reserve Building
150 East Fourth Street
4th Floor
Cincinnati, Ohio  45202
Telephone: (513) 629-9472
Facsimile: (513) 629-9426

**Counsel for Plaintiff**

## VERIFICATION FOR SHAREHOLDER DERIVATIVE ACTION

I, Robert Crocitto, do hereby depose and say on this 28th day of January, 2013, in the State of Nevada, Washoe County, that:

1. I have been the holder of the common stock of Facebook, Inc., either directly or beneficially, since May 24th, 2011.

2. I have read the Complaint to be filed on my behalf.

3. The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

4. I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this shareholder derivative action except for (1) such fees, costs, or other payments as the Court expressly approves to be paid to or on behalf of Plaintiff, or (2) reimbursement, paid by Plaintiff's attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this shareholder derivative action.

Robert Crocitto